UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF PUERTO RICO

**NOEMI RODRIGUEZ ARCE,**

      Plaintiff,

          v.

**THE PUERTO RICO OMBUDSMAN MANAGEMENT OFFICE; THE PUERTO RICO OMBUDSMAN OFFICE FOR RETIRED PERSONS AND THE ELDERLY; THE COMMONWEALTH OF PUERTO RICO,**

      Defendants.

CIV. NO. 12-1200(PG)

<u>OPINION AND ORDER</u>

    Before the court is the defendants' Motion for Summary Judgment (Docket No. 40), plaintiff's Opposition (Docket No. 49) and defendants' Reply (Docket No. 62). After a close examination of all the evidence on record and a careful review of the applicable statutory and case law, the court **DENIES** the defendants' motion for the reasons explained below.

I. BACKGROUND

    On March 21, 2012, Noemi Rodriguez Arce (hereinafter "Plaintiff" or "Rodriguez") filed a complaint (Docket No. 1) against the Puerto Rico Ombudsman Management Office, Puerto Rico Ombudsman for the Retired Persons and the Elderly, and the Commonwealth of Puerto Rico (hereinafter collectively referred to as "Defendants"). Subsequently, Plaintiff filed the First (Docket No. 5) and Second (Docket No. 8) Amended Complaints on April 4, 2012 and May 2, 2012, respectively. Finally, on May 25, 2012, Plaintiff filed a Third Amended Complaint. <u>See</u> Docket No. 12.

    In short, Plaintiff alleges that while working for the Puerto Rico Ombudsman Office for Retired Persons (hereinafter "Ombudsman Office" or "the Office") under the direct supervision of Wilma Cruz-Calo (hereinafter "Cruz-Calo"), she was the victim of retaliation, sex discrimination and sexual harassment conduct on the part of Cruz-Calo and the latter's direct supervisor, Carmen Ortiz Calderon (hereinafter "Ortiz"), <u>see</u> Docket No. 12 at

¶ 2, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.*.[1]

According to Plaintiff, she began to work at the Ombudsman Office on August 2007 under the direct supervision of Cruz-Calo. See Docket No. 12 at ¶ 11. Rodriguez claims that from February of 2008 until March of 2009 she sustained an intimate relationship with Cruz-Calo, who in turn had a consensual relationship with Ortiz. Id. at ¶¶ 13, 15. According to the complaint, on March of 2009, Plaintiff moved to end her relationship with Cruz-Calo. Id. at ¶ 16. As a result, from April of 2009 until May of 2011, Cruz-Calo allegedly "began a systematic sexual harassment and retaliation pattern against [Plaintiff] in the workplace," id. at ¶ 17, which included constant and continuous "sexually charged and denigrating comments to Plaintiff" as well as "veiled sexual invitations in order to renew their intimate relationship, in spite of Plaintiff's rejections," id. at ¶ 18. Cruz-Calo's behavior created a hostile work environment for Rodriguez. Id. at ¶ 19. In addition, after Ortiz became aware of Plaintiff's relationship with Cruz-Calo on or approximately at the end of the year 2010, she also began a pattern of discrimination and retaliation against Plaintiff. Id. at ¶ 22.

On January 2011, Plaintiff received a disciplinary memo signed by Hon. Rossana Lopez-Leon (hereinafter "Lopez-Leon"), the former Puerto Rico Ombudsman for the Elderly, notifying her of the intention of suspending Plaintiff from her job for a period of thirty (30) days. Id. at ¶ 24. Plaintiff also alleges that  Lopez-Leon "failed to protect Plaintiff from the retaliatory and gender discriminatory conduct and participated in the concealment of Ortiz and Cruz-Calo's conduct via the implementation of discriminatory and retaliatory employment decisions against Plaintiff." Id. at ¶ 25. Plaintiff claims this adverse employment action was recommended by Ortiz with Cruz-Calo's knowledge and consent absent any real basis or justification. Id. at ¶ 26. Plaintiff avers that, immediately after an incident during which Ortiz allegedly caught Cruz-Calo making a sexual advance to Plaintiff inside of a file room, Lopez-Leon gave her an amended notice of disciplinary action indicating the agency's intention to terminate her. Id. at ¶¶ 29-30.

Thereafter, on May of 2011, Plaintiff filed a sexual harassment complaint before the Ombudsman Office, as well as a gender discrimination charge before

---

[1]Plaintiff's supplemental state law claims pursuant to Puerto Rico Law No. 17 of April 22, 1988, P.R. Laws Ann. tit. 29 § 155, *et seq.*, Puerto Rico Law No. 69 of July 6, 1985, P.R. Laws Ann. tit. 29, § 1321, *et seq.*, and Puerto Rico Law No. 115 of December 20, 1991, P.R. Laws Ann. tit. 29 § 194, *et seq.* were dismissed without prejudice, as per her request, on March 27, 2013. See Docket No. 24.

the Equal Employment Opportunity Commission (hereinafter "EEOC"). Id. at ¶¶ 31, 33. Afterwards, and allegedly in response to Plaintiff's charges, Lopez-Leon forced Plaintiff to take a leave of absence. Id. at ¶ 34.

Lopez-Leon was subsequently replaced by Hon. Oscar Gonzalez Rivera (hereinafter "Gonzalez-Rivera"), who continued with the disciplinary procedure against Plaintiff that resulted in a thirty (30) day suspension without pay on February of 2012. Id. at ¶ 42. According to the complaint, Defendants received the EEOC's Notice of Right to Sue on or about March 16th, 2012, and subsequently, the Defendants notified Plaintiff on March 27, 2012 of their intention to terminate her from her employment. Id. at ¶ 43. Plaintiff was ultimately fired on April 26, 2012. Id. at ¶ 45.

After the Plaintiff filed the above-captioned complaint for sexual harassment and retaliation, the Defendants filed a motion (Docket No. 18) requesting that this court dismiss the above-captioned complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on Eleventh Amendment grounds. See Docket No. 18. On March 27, 2014, the court denied the Defendants' motion. See Docket No. 24.

Before the court is the Defendants' Motion for Summary Judgment (Docket No. 40), Plaintiff's Opposition (Docket No. 49) and Defendants' Reply (Docket No. 62). After a close examination of all the evidence on record and a careful review of the applicable statutory and case law, the court **DENIES** the Defendants' motion for the reasons explained below.

## II. SUMMARY JUDGMENT STANDARD

A motion for summary judgment is governed by Rule 56(c) of the Federal Rules of Civil Procedure, which allows disposition of a case if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Sands v. Ridefilm Corp., 212 F.3d 657, 660 (1st Cir.2000). A factual dispute is "genuine" if it could be resolved in favor of either party, and "material" if it potentially affects the outcome of the case. See Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir.2004).

To be successful in its attempt, the moving party must demonstrate the absence of a genuine issue as to any outcome-determinative fact in the record, see DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir.1997), through definite and competent evidence. See Maldonado-Denis v. Castillo Rodriguez, 23 F.3d 576, 581 (1st Cir.1994). Once the movant has averred that there is an absence of evidence to support the non-moving party's case, the burden shifts to the non-movant to establish the existence of at least one fact in issue that is both genuine and material. See Garside v. Osco Drug, Inc., 895 F.2d 46, 48

(1st Cir.1990) (citations omitted). If the non-movant generates uncertainty as to the true state of any material fact, the movant's efforts should be deemed unavailing. See Suarez v. Pueblo Int'l, 229 F.3d 49, 53 (1st Cir.2000). Nonetheless, the mere existence of "some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). However, "summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.1990).

At the summary judgment juncture, the court must examine the facts in the light most favorable to the non-movant, indulging that party with all possible inferences to be derived from the facts. See Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir.2002). The court must review the record "taken as a whole," and "may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 135 (2000). This is so, because credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Id.

### III. FACTUAL FINDINGS

After careful review, the court found the following facts to be undisputed:

1. Plaintiff Rodriguez started working for the Puerto Rico Ombudsman Office for Retired Persons and the Elderly on August 16, 2007.
2. Plaintiff's position was Coordinator of Programs for the Elderly I.
3. Plaintiff was assigned to the Protection and Defense Program.
4. Plaintiff's immediate supervisor was Wilma Cruz-Calo.
5. Cruz-Calo was Program Supervisor for the Puerto Rico Ombudsman Office for Retired Persons and the Elderly, and direct supervisor of the Plaintiff.
6. Cruz-Calo began working with the Office in 2004 as Director for the Program for the Elderly Victims of Crime, and as part of her responsibilities and duties was to manage and supervise personnel who were part of that proposal of Assistance to Victims of Crime.
7. Plaintiff was placed originally at what was called the Satellite Office of Carolina - Region 1 - that belonged to the Protection and Defense Program. The Carolina Region 1 office was closed by March 2009.
8. All Program Coordinators of the Region 1 were supervised by Cruz-Calo. As to all the Program Coordinators, Cruz-Calo: assigned them work, approved their work schedules, did their job performance evaluations,

recommend their job promotions, recommended their disciplinary measures, and all responded to her.

9.   Cruz-Calo supervised and authorized Plaintiff's work schedules, did all her job performance evaluations and was responsible for recommending any disciplinary actions, promotions or demotions.

10.  On August 16, 2007, Plaintiff received several documents from the Ombudsman Office, among those the rules and regulations and the public policy of the Office on sexual harassment on the workplace.

11.  The Ombudsman Office has a policy against sexual harassment that was approved on November 7, 1994, at a time when the Office was known as the Governor's Office for Elderly Affairs. All employees, at the moment they are recruited at the Ombudsman Office, receive copy of this policy.

12.  The Ombudsman Office's policy against sexual harassment sets forth the proceedings that an employee who considers has been subjected to sexual harassment must follow to file an internal complaint in the Ombudsman Office.

13.  The policy against sexual harassment of the Ombudsman Office states in its Article VII, subpart A, item 1, that any employee or officer that deem that was being subjected to sexual harassment, has a right to file a verbal or written complaint with the Director of the Division. The Director of the Division in turn had the duty of notifying no later than the next working day after learning of the situation, the Human Resources Director or in his/her absence, the Deputy Director of the agency, to start the complaint's internal procedure. The position of Deputy Director was eliminated once the name of the Office was changed to the Ombudsman Office.

14.  The policy of the Ombudsman Office also states in its Article VII, subpart A, item 2, that in case the harasser is the Director of the Division, the complaint can be filed directly with the Human Resources Director.

15.  Lissette Hernandez (hereinafter "Hernandez") was the Director of Human Resources of the Ombudsman Office for the Retired Persons and the Elderly from 2005 until 2012, who is in charge of implementing the sexual harassment policy at the agency.

16.  At the Office, if any employee comes to the office of the Director Of Human Resources and she becomes aware of the fact that the employee is or might be in a sexual harassment situation, the Director of Human Resources will activate or begin the process or the protocol included in the sexual harassment policy of the agency.

17.  The policy of sexual harassment provides that if there is a claim of
     sexual harassment the Ombudsman has to sign or designate an examiner or
     an investigator.

18.  During Hernandez's tenure as Human Resources Director of the Office -
     from 2005 to 2012 - she claims to never have received a sexual
     harassment complaint of any nature and has never conducted an
     investigation regarding sexual harassment claim.

19.  On October 25, 2010, Cruz-Calo, Principal Coordinator Protection and
     Defense, addressed through Carmen Ortiz, then Deputy Ombudsperson of
     Protection and Defense, to the Ombudsperson of the Office, Rossana
     Lopez-Leon, a recommendation of disciplinary action against Plaintiff
     detailing several violations to her duties as employee of the Office.

20.  Cruz-Calo and Ortiz live together since September 1st, 1997.

21.  The 2010 disciplinary recommendation against Plaintiff was a
     recommendation for disciplinary action made and drafted by Cruz-Calo and
     no other employee participated in the recommendations that are included
     or contained in that document.

22.  On January 26, 2011, Lopez-Leon, in her capacity as Appointing
     (Nominating) Authority, issued a letter of intention addressed to
     Plaintiff, notifying the latter of Lopez-Leon's intention of suspending
     Plaintiff of employment and salary for thirty (30) days, detailing
     several violations committed by Plaintiff to the norms and regulations
     and internal procedure of the Ombudsman.

23.  The letter of intention of January 26, 2011 addressed to Plaintiff
     advised her of her right to ask for an administrative hearing within
     fifteen (15) days after receiving that communication.

24.  An amended letter of intention dated March 17, 2011 addressed to
     Plaintiff advised her of her right to ask for an administrative hearing
     within fifteen (15) days after receiving that communication.

25.  Cruz-Calo was the only person from the Ombudsman Office who participated
     in the recommendation of that disciplinary action of March 2011 against
     Plaintiff.

26.  Plaintiff sent by certified mail to then Ombudsperson Lopez-Leon, a
     confidential complaint she wrote dated April 15, 2011, but received at
     the Office on May 17, 2011.

27.  In her confidential complaint addressed to former Ombudsperson Lopez-
     Leon, Plaintiff stated that as of the beginning of the year 2008, she
     had started a sentimental relationship with her immediate supervisor,
     Cruz-Calo, which they both decided to finish a few months after it began

and that from that moment on, Cruz-Calo launched a pattern of harassment, intimidation and persecution taking advantage of her position as supervisor against Plaintiff.

28. At the time that Plaintiff sent her confidential complaint, she was undergoing an administrative internal procedure.

29. It is the Office's position that this document does not contain a complaint of sexual harassment, and that there is no information contained in this document that presents a situation of unwanted or not consented to sexual advances.

30. It is the Ombudsman Office's position that only unwelcome sexual advances or relationships in the office described in the document will be considered a sexual harassment claim, since the policy on sexual harassment establishes that the advance must be sexual and unwanted. According to the Ombudsman Office, the Plaintiff's letter of April 15, 2011 did not meet those requirements.

31. On May 11, 2011, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) against the Ombudsman Office claiming sexual harassment.

32. On this charge of discrimination, Plaintiff claimed that she had a sentimental relationship with her then supervisor, Cruz-Calo, that had started on February 4, 2008, but that when Plaintiff finished the relationship with her, her supervisor's behavior was one of persecution, harassment, intimidation, humiliation towards her, among others.

33. The charge of discrimination gave June 2009 as the approximate earliest date when the discrimination took place, and March 28, 2011 as the latest date.

34. On June 29, 2011, the EEOC issued a notice of charge of discrimination to the Ombudsman Office, notifying the Office that a charge of employment discrimination had been filed against it under Title VII of the Civil Rights Act, which indicated that the circumstances of alleged discrimination was "sex."

35. The notice of charge of discrimination was sent by the EEOC through the mail on June 29, 2011.

36. The Office received two complaints from the EEOC from 2007 to 2012, including Plaintiff's.

37. No one at the Ombudsman Office was in charge of handling Plaintiff's EEOC charge.

38. From 2007 until 2012, Hernandez recalls only receiving a complaint from Rodriguez regarding situations that she was experimenting or

experiencing in her work area, regarding interpersonal relationships with a co-worker, Noemi Amador.

39. On May 19, 2011, former Ombudsperson Lopez-Leon issued a communication to Plaintiff sending her on vacation leave immediately.

40. On May 19, 2011, Plaintiff filed a case with the State Insurance Fund claiming that she suffered a severe emotional crisis when she was sent on vacation leave. Plaintiff claimed that she had been confronting a pattern of harassment by her superiors.

41. On May 19, 2011, plaintiff filed a second case with the State Insurance Fund claiming that due to non-favorable working conditions and excess of these, she had felt drained and exhausted physically and emotionally, had developed strong pain in the neck, back and lower back, pain and numbness in the extremities, muscle spasms for carrying boxes and bad posture due to non-appropriate equipment.

42. On this second complaint filed on May 19, 2011 with the State Insurance Fund, Plaintiff also asserted that on March 2, 2011 she had to carry a box that did not belong to her following orders of her supervisor and that she hurt herself.

43. Lopez-Leon's letter dated June 9, 2011 was the official response from the agency regarding the Plaintiff's letter of April 15, 2011.

44. On June 9, 2011, Lopez-Leon issued a letter to Plaintiff sent by certified mail regarding her confidential complaint summoning Plaintiff to render a statement on June 15, 2011, at 1:30 p.m. in the Office as part of the investigation process.

45. On June 13, 2011, Plaintiff responded to Lopez-Leon's letter, asking her to postpone the rendering of her statement due to her health condition.

46. On August 10, 2011, Plaintiff rejoined her job at the Office after the State Insurance Fund granted her leave to receive treatment while working ("CT" by its Spanish acronym).

47. The Ombudsman Oscar Gonzalez-Rivera authorized and approved an administrative assignment for Plaintiff until October 10, 2011, to the PAMA program that was signed by the Director of Human Resources, Lissette Hernandez. The assignment did not affect Plaintiff's salary.

48. This administrative assignment was not a disciplinary action.

49. Plaintiff responded that she preferred to remain in PAMA, and accepted the assignment to the PAMA program.

50. On October 25, 2011, an extension of the assignment to the PAMA program was issued to Plaintiff by Director of Human Resources Hernandez until November 15, 2011. This extension was authorized by Ombudsman Gonzalez-

Rivera. Plaintiff received this notification on October 26, 2011. The extension of the assignment did not affect Plaintiff's salary.

51.   On November 14, 2011, Director of Human Resources Hernandez issued another extension to the PAMA program to Plaintiff, which she received on November 16, 2011, and as authorized by Ombudsman Gonzalez-Rivera until December 15, 2011. The extension of the assignment did not affect Plaintiff's salary.

52.   On December 14, 2011, received by Plaintiff on December 23, 2011, another extension to the PAMA program was issued to Plaintiff by Hernandez, and as authorized by Ombudsman Gonzalez-Rivera until January 30, 2012. The extension of the assignment did not affect Plaintiff's salary.

53.   On January 30, 2012, received by Plaintiff on February 6, 2012, another extension to the PAMA program was issued to Plaintiff by Hernandez and as authorized by Ombudsman Gonzalez-Rivera, until April 30, 2012. The extension of the assignment did not affect Plaintiff's salary.

54.   While assigned to PAMA, Plaintiff had no relationship with Cruz-Calo.

55.   At the administrative hearing held on December 9, 2011, Plaintiff testified under oath.

56.   Since August 10, 2011, another person was Plaintiff's supervisor because she was assigned to PAMA.

57.   At the administrative hearing, Plaintiff testified under oath that she had begun a sentimental relationship with her supervisor approximately on February 4, 2008.

58.   At the administrative hearing, Plaintiff testified under oath that in March 2009 she said to Cruz-Calo that she would not continue with any kind of relationship.

59.   At the administrative hearing, Plaintiff testified under oath that even while her sentimental relationship with her supervisor was ongoing, her supervisor displayed an attitude that was a little strange and hostile. At certain moments while Plaintiff and her supervisor were having a sentimental relationship, Plaintiff observed that her supervisor assumed a hostile deportment towards Plaintiff, consisting in humiliations and acts of disrespect.

60.   At the administrative hearing, Plaintiff testified under oath that once she broke up the sentimental relationship with her supervisor, her supervisor almost did not talk to Plaintiff.

61.   At the administrative hearing, Plaintiff testified under oath that after March 2009, after she had finished her relationship with her supervisor,

her supervisor had a meeting with her and Dania Vázquez, a supervisor from another program who served as witness, in which Plaintiff's supervisor talked to her about certain topics regarding the punch clock registry and clothing and the way the supervisor talked to Plaintiff was hostile; Plaintiff's supervisor did not allow Plaintiff to answer and imputed things to Plaintiff that were not true; Plaintiff felt threatened.

62.   At the administrative hearing, Plaintiff testified under oath that for the year 2010, Cruz-Calo's attitude towards her was hostile, consisting in that Plaintiff called her up at her supervisor's cell phone but her supervisor would not answer Plaintiff's calls most of the time.

63.   At the administrative hearing, Plaintiff testified under oath that when she went to notify her supervisor something about a case, her supervisor did not have time to meet with her and that sometimes her supervisor used strong, hostile language towards Plaintiff, like threatening, in front of Plaintiff's coworkers.

64.   At the administrative hearing, Plaintiff testified under oath as an example of the hostility that her supervisor displayed towards her, that when she went near her supervisor's office, her supervisor said to her "I cannot see you now."

65.   At the administrative hearing, Plaintiff testified under oath that she would talk to her supervisor and her supervisor would not answer to her, that it was like if Plaintiff was not talking, that her supervisor ignored her, as another example of the hostility Plaintiff's supervisor displayed toward Plaintiff.

66.   At the administrative hearing, Plaintiff testified under oath that at staff meetings her supervisor did not allow her to speak.

67.   At the administrative hearing, Plaintiff testified under oath that at staff meetings her supervisor would ask her questions about human resources that had nothing to do with the meeting and that Plaintiff felt pressured or harassed and that when Plaintiff answered, her supervisor would say "that's not right, that's not right."

68.   Plaintiff could not remember any comments, any remarks made by Carmen Ortiz to her in which Ortiz made reference to the intimate relationship Plaintiff had with Cruz-Calo.

69.   On February 19, 2012, Plaintiff received a written reprimand from Ombudsman Gonzalez-Rivera dated February 6, 2012.

70. The complaint against Plaintiff's behavior by a doctor named César Alcántara was investigated by Lissette Hernandez in her capacity as Human Resources Director.

71. On February 23, 2012, Plaintiff received a letter from Ombudsman Gonzalez-Rivera imposing upon her a suspension of employment and salary for thirty (30) days, attaching copy of the report by the examining officer.

72. Plaintiff's thirty (30) day suspension from employment and salary was effective upon the moment she received the letter from Ombudsman Gonzalez-Rivera.

73. Plaintiff was suspended from employment and salary from February 23, 2012 until April 4, 2012.

74. The report by the examining officer detailed the charges stated against Plaintiff in the amended letter of intention of March 28, 2011 and indicated those charges that were not dismissed.

75. The examining officer concluded in her report that the documentary and testimonial evidence offered at the hearing proved unequivocally that Plaintiff committed the violations alleged by the agency.

76. On March 6, 2012, Sandra Torres, Esq., President of the Telecommunications Reglamentary Board, sent via electronic mail to Ombudsman Gonzalez-Rivera a complaint against Plaintiff, which was investigated by Hernandez in her capacity as Human Resources Director.

77. Hernandez drafted a report addressed to Ombudsman Gonzalez-Rivera with her findings on the investigation she conducted of the complaint filed by Sandra Torres, Esq. as President of the Telecommunications Reglamentary Board.

78. Plaintiff was serving a suspension of employment and salary of thirty (30) days as of the moment when the incident she had at the Telecommunications Reglamentary Board took place.

79. In her report to Ombudsman Gonzalez-Rivera regarding the incident Plaintiff had at the Telecommunications Reglamentary Board, Hernandez recommended Plaintiff's termination of employment with the Ombudsman Office for the Elderly.

80. On March 16, 2012, Ombudsman Gonzalez-Rivera issued a communication to Plaintiff notifying her of his intention to terminate her.

81. The notice of intent of termination afforded Plaintiff the opportunity to be heard at a hearing on April 11, 2012.

82. The examining officer considered Plaintiff's position submitted in writing when issuing her decision of the intent to terminate Plaintiff.

83.   The examining officer recommended the termination of Plaintiff from her
      employment.
84.   On April 26, 2012, the Ombudsperson, Concepción Silva, notified
      Plaintiff of her immediate termination upon receipt of her letter issued
      on even date.
85.   Plaintiff received the letter of termination and a copy of the report by
      the examining officer on April 26, 2012.

### IV. DISCUSSION

Plaintiff claims she was the victim of sexual harassment and retaliation
for opposing her supervisor's unlawful employment practices in violation of
Title VII and various local laws.

**A. Title VII Claims**

   **1. Sexual Harassment**

Title VII, which prohibits discrimination because of sex, provides "that
'[i]t shall be an unlawful employment practice for an employer … to
discriminate against any individual with respect to his compensation, terms,
conditions, or privileges of employment, because of such individual's race,
color, religion, sex, or national origin." Oncale v. Sundower Offshore Servs.,
Inc., 523 U.S. 75, 78 (1998) (citing 42 U.S.C. § 2000e-2(a)(1)). "[S]exual
harassment is a form of sex discrimination, the Supreme Court tells us — by
committing or tolerating sexual harassment against an employee, an employer
has effectively altered the terms or conditions of the victim's job." Medina-
Rivera v. MVM, Inc., 713 F.3d 132, 136 (1st Cir.2013) (citing Burlington
Indus., Inc. v. Ellerth, 524 U.S. 742, 751–54, 118 S.Ct. 2257, 141 L.Ed.2d 633
(1998)). "There are various types of actionable sexual harassment claims under
Title VII: hostile work environment claims, *quid pro quo* harassment claims and
retaliation claims." Perez v. Developers Diversified Realty Corp., 904
F.Supp.2d 156, 163 (D.P.R. 2012) (citing Valentin–Almeyda v. Municipality of
Aguadilla, 447 F.3d 85, 94 (1st Cir.2006)).

In the case at hand, the Plaintiff complains of a hostile work
environment in the workplace. The key elements of a hostile-work-environment
claim are as follows:

> (1) the plaintiff belongs to a protected group; (2) she
> was subject to unwelcome sexual harassment; (3) the
> harassment was based on her sex; (4) the harassment was
> sufficiently severe or pervasive to alter the
> conditions of employment and create a
> discriminatorily-abusive work environment; (5) the
> complained-of conduct was both objectively and
> subjectively offensive; and (6) there is a basis for
> employer liability.

Medina-Rivera, 713 F.3d at 137 n. 2. "Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment … ." 29 C.F.R. § 1604.11 (2010). "One type of sexual harassment … involves 'bothersome attentions or sexual remarks' so 'severe or pervasive' that they create a 'hostile work environment.'" Medina-Rivera, 713 F.3d at 136 (internal citations omitted). Whether or not the harassing treatment meets the "severe or pervasive" standard, the First Circuit Court of Appeals has held that a court must consider several relevant factors including "the severity of the conduct, its frequency, whether it is physically threatening or not, and whether it interfered with the victim's work performance." Gerald v. Univ. of P.R., 707 F.3d 7, 18 (1st Cir.2013). Notwithstanding, "a single act of harassment may, if egregious enough, suffice to evince a hostile work environment." Noviello v. City of Boston, 398 F.3d 76, 84 (1st Cir.2005).

A Title VII hostile work environment claim also exists where a "workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Harris v. Forklift Sys., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). Plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment. See Forrest v. Brinker Intern. Payroll Co., LP, 511 F.3d 225, 228 (1st Cir.2007) (internal citations and quotations omitted).

In their motion for summary judgment, the Defendants argue that Rodriguez has no evidence to support her claim of sexual harassment and that the conduct she complains was not severe or pervasive enough to create a hostile work environment. See Docket No. 40. Their argument is based on the Plaintiff's testimony during an administrative hearing in December of 2011, which was held after Cruz-Calo recommended to Lopez-Leon the suspension of Plaintiff after allegedly incurring into some violations to the norms and regulations and internal procedure of the Ombudsman Office. According to Defendants, Rodriguez's claims of sexual harassment hold no water in light of her testimony during this administrative hearing. Notwithstanding, it is an uncontested fact that during this hearing the Plaintiff testified that Cruz-Calo submitted her to humiliations and acts of disrespect, and gave her the silent treatment and reprimanded her after they allegedly broke up. See Fact No. 59-63. Given the parties' admissions of facts, the court is not convinced by the Defendants' interpretation of events that the Plaintiff's testimony

during the administrative hearing was completely devoid of any reference to the hostile work environment she was allegedly suffering.

Additionally, the Defendants' version also differs from the Plaintiff's testimony during her deposition wherein she gives multiple detailed examples of instances where Cruz-Calo sexually harassed her subsequent to their break up. See Docket No. 46 at ¶¶ 24-36. On the other hand, Cruz-Calo denies having a relationship of a sexual nature with the Plaintiff, making any sexual advances towards the Plaintiff and sexually harassing and insulting the Plaintiff, for which the latter now complains. See Docket No. 46 at ¶¶ 56-58, 62-63.

The parties' assertions here are clearly juxtaposed as to a fact that is the crux of the matter at hand, to wit, whether or not the Plaintiff was in fact the victim of unwelcome sexual harassment on the part of her supervisor, Cruz-Calo, and if so, whether or not the instances the Plaintiff describes are deemed severe or pervasive enough to alter the conditions of her employment and create a discriminatorily-abusive work environment. To decide whether summary judgment is warranted would require that the court weigh the evidence and decide who is more credible, Plaintiff or the Defendants' witnesses. This the Court cannot do. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. See Reeves, 530 U.S. at 135. Simply put, Plaintiff's evidence "establishes factual disagreements as to which reasonable minds may differ. No more is exigible … Right or wrong, the plaintiff is entitled to present her case to a jury." See Cortes-Irizarry v. Corporacion Insular De Seguros, 111 F.3d 184, 189 (1st Cir.1997)(internal quotations omitted).

Finally, in their defense, the Defendants also argue that the Plaintiff never filed with the Human Resources Office a verbal or written complaint of sexual harassment as required by the Office's policy, and thus, the Defendants are not liable under the negligence standard set out in Vance v. Ball State University, 133 S.Ct. 2434, 2439 (2013), insofar as the only person with authority over the Plaintiff was the Ombudsman and "Cruz Calo [was] merely a co-worker," Docket No. 40 at 21. Pursuant to Vance, under Title VII, when "the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." Vance v. Ball State University, 133 S.Ct. 2434, 2439 (2013). "Typically, this involves a showing that the employer knew or should have known about the harassment, yet failed to take prompt action to stop it." Noviello, 398 F.3d at 95.

The Defendants' theory first fails because it is an uncontested fact that Wilma Cruz-Calo was Plaintiff's immediate supervisor. See Fact No. 4. Second,

the Plaintiff asserts that between January and March of 2010, she told Human Resources Director Hernandez that she was suffering from a situation of sexual harassment in the workplace on the part of Cruz-Calo ever since March of 2009. She claims to have told her in detail about the relationship that Cruz-Calo and her had sustained and how it had ended; that she had not stopped harassing her sexually in the workplace; that Cruz-Calo was persecuting her. See Docket No. 46 at ¶ 79. However, Hernandez does not recall. See Fact No. 38. Once again, in light of Plaintiff's and Hernandez's conflicting versions, whether the Plaintiff complied with the Defendants' sexual harassment policy and lodged a complaint is an issue of fact in dispute.

For the foregoing reasons, construing the facts in the light most favorable to the Plaintiff, this court hereby **DENIES** the Defendants' motion for summary judgment as to the Plaintiff's sexual harassment claim (Docket No. 40).

### 2. Retaliation

In her complaint, the Plaintiff alleged that she was forced to take a leave of absence, was suspended, and terminated in retaliation for protesting about sexual harassment and a hostile work environment. See Docket No. 1.

Title VII makes it unlawful for an employer to retaliate against a person who complains about discriminatory employment practices. See 42 U.S.C. § 2000e-3(a). Title VII's anti-retaliation provision provides that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees … because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). In Univ. of Texas Sw. Med. Ctr. v. Nassar, ---U.S. ----, 133 S.Ct. 2517 (2013), the Supreme Court recently held as to Title VII retaliation claims that "[t]he text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a **but-for** cause of the alleged adverse action by the employer." Id. at 2534 (emphasis ours). Therefore, "[i]t rejected the less stringent standard that the plaintiff must show only that retaliation was a 'motivating' factor." Ponte, 2014 WL 341166 at *9.

Retaliation claims "based on circumstantial evidence are evaluated using the McDonnell Douglas burden-shifting framework." Id. (citations omitted). To succeed on a retaliation claim, a plaintiff must first prove these elements: (1) that she undertook protected conduct; (2) that her employer took a material adverse action against her; and, (3) that a causal nexus exists

between elements one and two. See Medina-Rivera, 713 F.3d at 139 (internal citations omitted).

The Plaintiff testified during her deposition that after the break-up, she would tell her supervisor, Cruz-Calo, to stop the sexual harassment and let her work in peace. See Docket No. 46 at ¶ 25. She also claims to have complained about the sexual harassment to Hernandez from Human Resources between January and March of 2010. See id. at ¶ 79. Then, on October 25, 2010, Cruz-Calo recommended to then Ombudsperson Lopez-Leon that a disciplinary action be taken against Plaintiff, which Lopez-Leon adopted on January 26, 2011. See Facts No. 19, 22. Subsequently, it is undisputed that Plaintiff sent Lopez-Leon a confidential complaint she wrote on April 15, 2011, but that the Office received on May 17, 2011. See Fact No. 26. Therein, Plaintiff stated that as of the beginning of the year 2008, she had started a sentimental relationship with her immediate supervisor, Cruz-Calo, which they both decided to finish a few months after it began and that from that moment on, Cruz-Calo launched a pattern of *harassment, intimidation and persecution* taking advantage of her position as supervisor against Plaintiff. See Fact No. 27 (emphasis ours). Two days later, on May 19, 2011, Lopez-Leon issued a communication to Plaintiff sending her on vacation leave immediately. See Fact No. 39. Then, on or around June 29, 2011, the Office received the notice regarding the Plaintiff's charge before the EEOC, which had been originally filed on May 11, 2011. See Fact No. 39. The disciplinary action continued against the Plaintiff at the administrative level until she was suspended for thirty days on February 23, 2012 as a result thereof. See Fact No. 71. Finally, on March 21, 2012, the Plaintiff filed the above-captioned complaint, see Docket No. 1, and she was terminated on April 26, 2012, see Fact No. 84.

In their motion for summary judgment, the Defendants contend *inter alia* that some of the disciplinary processes that took place against Plaintiff predate her EEOC complaint in May of 2011. See Docket No. 40 at pages 23-24. However, it is a fact in dispute whether or not Plaintiff complained to Cruz-Calo and Hernandez before Cruz-Calo's recommendation to Lopez-Leon that the Plaintiff be suspended. "[P]rotected conduct under Title VII's anti-retaliation provision is not limited to filing an administrative charge of discrimination. It expressly prohibits retaliation for 'oppos[ing] any practice made an unlawful practice' by Title VII." Petrarca v. Southern Union Co., No. 04-310S, 2007 WL 547690 at *12 (D.R.I. 2007) (citing 42 U.S.C. § 2000e-3(a)). See also Perez-Cordero v. Wal-Mart Puerto Rico, Inc., 656 F.3d 19, 31 (1st Cir.2011) (finding plaintiff's reporting of complaints to his superiors about the harassment to which he was subjected suffice to show his

"opposition" to that harassment, within the meaning of Title VII); <u>Matima v. Celli</u>, 228 F.3d 68, 78-79 (2d Cir.2000) ("The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, 'including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges.'").

In accordance with the applicable caselaw, the court finds that a question of fact exists as to whether the Plaintiff engaged in protected conduct, whether it took place before or after the disciplinary actions taken against her, and whether a retaliatory animus was the but-for cause of these disciplinary measures. The entire matter is a classic he said/she said dispute. "It is well-settled that a judge must not engage in making credibility determinations or weighing the evidence at the summary judgment stage … ." <u>Pina v. Children's Place</u>, 740 F.3d 785, 802 (1st Cir.2014). Moreover, "courts should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent … ." <u>Adamson v. Walgreens Co.</u>, No. 13-1511, 2014 WL 1674164 at *7 (1st Cir. April 29, 2014)(citations omitted). Because the evidence presented by Plaintiff creates a triable issue of fact as to whether she was reprimanded and disciplined in retaliation for complaining of sexual harassment, we hereby **DENY** the Defendants' request that the Plaintiff's retaliation claims de dismissed.

### V. CONCLUSION

For the reasons stated above, this court hereby **DENIES** Defendants' motion for summary judgment (Docket No. 40).

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, May 9, 2014.

<u>S/ JUAN M. PEREZ-GIMENEZ</u>
JUAN M. PEREZ-GIMENEZ
U.S. DISTRICT JUDGE